**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 24-cv-01673-NYW-CYC

AMERICAN ECONOMY INSURANCE COMPANY,

      Plaintiff/Counterclaim Defendant,

v.

SCOTT SEPIC,
PAGE SEPIC, and
VESTA DENVER, LLC,

      Defendants/Counterclaim Plaintiffs.

---

### MEMORANDUM OPINION AND ORDER

---

This matter comes before the Court on Plaintiff's Motion for Summary Judgment. [Doc. 69].  The Court has reviewed the Motion and concludes that oral argument would not materially assist in its resolution.  For the reasons explained in this Order, the Motion for Summary Judgment is **GRANTED in part** and **RESERVED in part**.

### BACKGROUND

Plaintiff American Economy Insurance Company ("Plaintiff" or "American Economy") issued a homeowners' insurance policy (the "Policy") to Scott Sepic, Page Sepic, and Vesta Denver, LLC (collectively, "Defendants" or the "Sepics").  [Doc. 1 at ¶ 11].  After a fire, the Sepics "demanded [insurance] coverage from Plaintiff for the damage to" the property.  [*Id.* at ¶¶ 36, 39].  American Economy denies that coverage exists, so it filed this declaratory judgment suit on June 14, 2024, seeking inter alia a declaration that "no coverage is available under the Policy for any damage to the [home] as a result of the . . . fire."  [*Id.* at ¶ 47].

The Sepics then asserted counterclaims for breach of contract, bad faith breach of an insurance contract, and unreasonable delay or denial of insurance benefits. [Doc. 15 at ¶¶ 92–109]. Relevant here, they allege that American Economy breached the Policy by "denying coverage and refusing to pay benefits for covered damage, including but not limited to dwelling, personal property, and additional living expense benefits." [*Id.* at ¶ 94]. They also allege that American Economy breached its duty of good faith and fair dealing by, inter alia, "[f]ailing to conduct a prompt and thorough investigation of coverage based upon all available information" and "[m]isrepresenting pertinent facts and insurance policy provisions relating to coverage." [*Id.* at ¶ 99].

During the early stages of discovery, Defendants moved for partial summary judgment in their favor on Plaintiff's declaratory judgment claim and some of Plaintiff's affirmative defenses to their counterclaims. [Doc. 38]. This Court largely denied that motion, but granted summary judgment in Defendants' favor on some of Plaintiff's affirmative defenses. [Doc. 68].

On October 15, 2025, Plaintiff filed its Motion for Summary Judgment, seeking judgment in its favor on its declaratory judgment claim and all of Defendants' counterclaims. [Doc. 69]. The Motion is fully briefed and ready for resolution.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive

2

law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (cleaned up).

At summary judgment, a movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once this movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

**UNDISPUTED MATERIAL FACTS**

The following undisputed material facts are drawn from the summary judgment record:

1.    American Economy issued a homeowners' insurance policy (the "Policy") to Defendants that was in effect at all relevant times. [Doc. 69 at ¶ 1; Doc. 80 at 2; Doc. 69-1].

2.    The Policy provides that American Economy "will pay claims and provide coverage as described in this policy if you pay your premiums when due, comply with all

3

applicable provisions outlined in this policy, and inform us of any change in title, use, or occupancy of the residence premises."  [Doc. 69 at ¶ 2; Doc. 80 at 2; Doc. 69-1 at 29].

3.      The Policy provides coverage for "accidental direct physical loss to property described in Building Property We Cover except as limited or excluded."  [Doc. 69 at ¶ 4; Doc. 80 at 2; Doc. 69-1 at 32].

4.      Under the Policy, "Building Property We Cover" includes:

1.  the dwelling on the **residence premises** shown in your Policy Declarations used principally as a private residence, including structures attached to the dwelling other than fences, driveways or walkways;

2.  attached carpeting, built-in appliances, fixtures; and

3.  materials and supplies located on or next to the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises**.

[Doc. 69 at ¶ 5; Doc. 80 at 2; Doc. 69-1 at 32].

5.      The Policy defines "residence premises" as

(1)  the one, two, three or four family dwelling, used principally as a private residence;

(2)  other structures and grounds; or

(3)  that part of any other building;

where you reside and which is shown in your Policy Declarations.

[Doc. 69 at ¶ 7; Doc. 80 at 2; Doc. 69-1 at 31].

6.      The Policy Declarations list the "Insured Location" as 3500 Belcaro Drive, Denver, Colorado 80209-4917.  [Doc. 69 at ¶ 9; Doc. 80 at 2; Doc. 69-1 at 11].

7.      The Sepics never moved into the house on Belcaro Drive (the "Belcaro Drive Home") and never slept there.  [Doc. 69 at ¶ 11; Doc. 80 at 3; Doc. 69-2 at 18:5–21, 20:21–21:3; Doc. 69-3 at 40:13–25].

8.      In December 2020, Defendants demolished the Belcaro Drive Home.  [Doc. 69 at ¶ 14; Doc. 80 at 2; Doc. 69-2 at 50:3–10; Doc. 69-3 at 17:13–15].

9.      From December 2020 through December 2023, the Sepics did not tell American Economy that they demolished the Belcaro Drive Home.  [Doc. 69 at ¶ 15; Doc. 80 at 3; Doc. 69-3 at 17:16–23].

10.     The Sepics began building a new home on the same lot, with a new address:  800 South Madison (the "Madison Street Home").  [Doc. 80 at ¶ 14; Doc. 91 at 3; Doc. 38-3 at ¶ 12; Doc. 38-6 at 1; Doc. 38-7 at 2].

11.     Page Sepic was present at the Madison Street Home approximately once per week "to see what [was happening]" and to provide input on design.  [Doc. 69 at ¶ 17; Doc. 80 at 2; Doc. 69-2 at 27:23–28:14].

12.     Scott Sepic was present at the Madison Street Home four to five times per week to coordinate with contractors and to make sure "everything was built to a high-level quality and to the exact specifications of [the Sepics'] drawings."  [Doc. 69 at ¶ 18; Doc. 80 at 2; Doc. 69-3 at 47:3–48:18].

13.     The Sepics never stayed the night at the Madison Street Home.  [Doc. 69 at ¶ 20; Doc. 80 at 2; Doc. 69-3 at 12:21–25].

14.     The Sepics maintained another place of lodging during the demolition of the Belcaro Drive Home and the construction of the Madison Street Home.  [Doc. 69 at ¶¶ 25–26; Doc. 80 at 2; Doc. 69-3 at 21:8–15, 23:19–21, 25:20–26:4].

15.     On December 30, 2023, a fire occurred at the Madison Street Home while it was under construction.  [Doc. 69 at ¶¶ 22, 26; Doc. 80 at 2; Doc. 69-3 at 19:2–4; Doc. 38-3 at ¶ 16].

16.     A Certificate of Occupancy was never issued for the Madison Street Home prior to the fire.  [Doc. 69 at ¶ 23; Doc. 80 at 2; Doc. 69-3 at 19:5–10].

## ANALYSIS

American Economy moves for summary judgment on its declaratory judgment claim and all of the Sepics' counterclaims, principally arguing that there is no coverage under the Policy for any loss arising from the fire at the Madison Street Home.  [Doc. 69].  Specifically, it argues that there is no coverage under the Policy because the Madison Street Home does not fit within the Policy's definition of "residence premises."  [*Id.* at 11–14].  In the alternative, it asserts that there is no coverage because the Sepics did not satisfy two preconditions to coverage.  [*Id.* at 15–17].  Then, because (in its view) there is no coverage, Plaintiff also argues that it is entitled to summary judgment on Defendants' breach of contract and bad faith counterclaims.  [*Id.* at 17–19].

## I.    Whether Policy Provides Coverage for the Madison Street Home

As mentioned above, the Policy provides building property coverage over "the dwelling on the ***residence premises*** shown in your Policy Declarations used principally as a private residence, including structures attached to the dwelling other than fences, driveways or walkways."  [Doc. 69-1 at 32].  And "residence premises" is defined as

(1)   the one, two, three or four family dwelling, used principally as a private residence;

(2)   other structures and grounds; or

(3)   that part of any other building;

where you reside and which is shown in your Policy Declarations.

[*Id.* at 31].

Plaintiff argues that Defendants cannot establish coverage under the Policy because the Madison Street Home does not fall within this definition of "residence premises." [Doc. 69 at 11]. Specifically, it argues that (1) the Madison Street Home is not "shown in" the Policy Declarations, [*id.* at 12]; (2) it is undisputed that the Sepics did not "reside" at the Madison Street Home, [*id.* at 13–14]; and (3) the Sepics cannot establish that the Madison Street Home was "used principally as a private residence," [*id.* at 14]. The Court agrees with American Economy that there is no genuine issue of material fact as to whether the Sepics resided at the property and no reasonable jury could conclude that the Sepics did, in fact, reside at the Madison Street Home.

The Policy does not define the term "reside," *see* [Doc. 69-1], so the Court applies the term's plain and ordinary meaning, construing it "as [it] would be understood by a person of ordinary intelligence," *Smith v. State Farm Mut. Auto. Ins. Co.*, 399 P.3d 771, 773 (Colo. App. 2017) (quoting *State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 167 (Colo. 1993)); *see also Sullivan v. Nationwide Affinity Ins. Co. of Am.*, 842 F. App'x 251, 254 (10th Cir. 2021) (recognizing that "the Colorado Supreme Court has eschewed the use of 'technical readings' and instead looks to 'what meaning a person of ordinary intelligence would attach to' a policy term") (quoting *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1051 (Colo. 2011)). Colorado courts often rely on dictionaries to articulate the

plain meaning of words or terms.  *See Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 502, 507 (Colo. 2004) (collecting cases).[1]

"Reside" means "to dwell permanently or continuously: have a settled abode for a time: have one's residence or domicile."  *See Reside*, Webster's Third New Int'l Dictionary at 1931 (1993);[2] *see also Pour v. Liberty Mut. Pers. Ins. Co.*, 160 F.4th 899, 907 (8th Cir. 2025) (recognizing this same plain meaning); *Korbel v. Lexington Ins. Co.*, 308 F. App'x 800, 805 (5th Cir. 2009) (recognizing that "the generally prevailing meaning of 'reside'" is "to dwell permanently or for a considerable time, to have one's settled or usual abode, to live, *in* or *at* a particular place" (quotation omitted); *cf. Potter v. State Farm Mut. Auto. Ins. Co.*, 996 P.2d 781, 783 (Colo. App. 2000) ("In general, residence denotes a place where a person dwells.").  Similarly, "residence" is defined as "the place where one actually lives or has his home as distinguished from his technical domicile."  *Residence*, Webster's Third New Int'l Dictionary at 1931 (1993).

The Parties do not cite, and the Court could not locate, a case from a Colorado state court discussing what it means to "reside" at a place for purposes of a homeowners' insurance policy.  In *Iowa Nat. Mut. Ins. Co. v. Boatright*, the Colorado Court of Appeals identified a number of factors relevant to determining whether a person is a resident of an insured's household.  *See* 516 P.2d 439, 440 (Colo. App. 1973).  Those factors are

---

[1] Because the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, *see* [Doc. 1 at ¶¶ 6–7], it applies the substantive law of the forum state, including the forum's choice-of-law rules, *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009) (applying Colorado law).  In Colorado, the interpretation of an insurance policy is "governed by the law of the state with the most significant relationship to the insurance contract."  *Id.*  The Parties here do not make choice-of-law arguments, but they both apply Colorado law.  [Doc. 61; Doc. 80].  The Court thus assumes that Colorado law applies.

[2] And "dwell" means to "live" or "reside."  *Dwell*, Webster's Third New Int'l Dictionary at 706 (1993).

> [t]he subjective or declared intent of the individual, . . . the formality or informality of the relationship between the individual and the members of the household, . . . the existence of another place of lodging by the alleged resident, . . . and the relative permanence or transient nature of the individual's residence in the household.

*Id.* The Tenth Circuit has described these factors as "an authoritative means of ascertaining whether a person 'resides' at a location for purposes of insurance coverage under Colorado law" and has approved a district court's consultation of the factors "for guidance" in a similar case. *See Olave v. Am. Fam. Mut. Ins. Co.*, No. 23-1337, 2024 WL 3825079, at *6 (10th Cir. Aug. 15, 2024). While some of these factors may have limited utility in this case, and one (the formality of the household relationship) is completely inapplicable, the Court consults these factors for guidance, as well as persuasive authority from other jurisdictions, to decide whether there is a genuine dispute of material fact as to the Sepics' residency. *See, e.g., Pour*, 160 F.4th at 907 (applying Minnesota law and finding the following factors, typically used to address whether someone is a "resident" of an insured's household, relevant in interpreting "where you reside": the person's plans to leave or return, whether the person receives mail at the home, pays rent, the establishment of a separate residence, and frequency and duration of the person's stays at the home).

The Sepics insist that there are genuine disputes of material fact as to whether they resided at the Madison Street Home at the time of the loss, and those disputes must be decided by a jury. [Doc. 80 at 15]. First, they rely on the fact that "American Economy alleged in its Complaint that the Sepics reside at 800 S. Madison Street," and "[t]he Sepics admitted this allegation in their Answer." [*Id.* (first citing Doc. 1 at ¶¶ 2–3; then citing Doc. 15 at ¶¶ 2–3)]. They argue that "[f]acts that are alleged and admitted in the pleadings

9

are, of course, no longer at issue," such that "[t]he Sepics' residency at [the Madison Street Home] is therefore established as a matter of law." [*Id.*]. American Economy does not respond to this argument in its reply brief. *See* [Doc. 91]. However, the Court declines to rely on this purported judicial admission to find a genuine dispute of fact as to the Sepics' residency, since an allegation made on June 14, 2024 (the date the Complaint was filed) that the Sepics *then* resided at the Madison Street Home does not constitute a judicial admission that the Sepics resided at the Madison Street Home *on the date of the loss*.

The Sepics also argue that there are "mountains of additional evidence that" they resided at the Madison Street Home at the time of the fire. [Doc. 80 at 15]. They argue that they were physically present at the Madison Street Home "on a regular basis for extended periods of time," they received their mail at that property, and they listed the Madison Street address as their place of residence on their driver's licenses and voter registrations. [*Id.*]. They also argue that they "entertained friends" at and maintained the grounds of the Madison Street Home. [*Id.* at 16].[3]

This evidence, however, does not create a genuine issue of material fact as to whether the Sepics actually resided—i.e., dwelled or *lived*—at the Madison Street Home. *Reside*, Webster's Third New Int'l Dictionary at 1931 (1993); *Korbel*, 308 F. App'x at 805. Notably, the evidence the Sepics cite to establish their residence at the Madison Street Home is all tied to the ongoing construction at the home. For instance, the Sepics assert

---

[3] The Sepics also assert that they "played with their children" at the Madison Street Home, but this assertion is not supported by a citation to record evidence. [Doc. 80 at 16]. As for "maintain[ing] the grounds," Ms. Sepic testified that "[they] didn't do that personally, but [they] made sure it was done." [Doc. 80-9 at 28:22–29:2].

that they "entertained friends" at the Madison Street Home.  [Doc. 80 at ¶ 46].  But the evidence cited in support shows only that they would tour the Madison Street Home with friends to show the construction's progress.  *See* [Doc. 80-6 at 50:13–16, 22–24; *id.* at 50:25–51:4].[4]   They also contend that they "kept a substantial amount of personal property" at the Madison Street Home.  [Doc. 80 at ¶ 45].  But the "personal property" they kept at the Madison Street was "all related to the construction of the home."  [Doc. 80-6 at 51:23–52:18 ("[I]t was appliances and other construction materials, wallpapers, some [fixtures, furnishings, and equipment]."); Doc. 80-9 at 30:11–20].  And although the Sepics assert that they were "physically present" at the home on a regular basis, [Doc. 80 at 16], the evidence cited in support demonstrates that their presence was similarly related to the construction and checking on its progress, *see* [Doc. 80 at ¶¶ 39–40; Doc. 80-6 at 47:3–49:6; Doc. 80-9 at 28:2–29:2].

It is undisputed that the Sepics maintained a separate place of lodging at all relevant times and *never* spent the night at the Madison Street Home.  [Doc. 69 at ¶¶ 20, 25–26; Doc. 80 at 2]; *see also Boatright*, 516 P.2d at 440 (considering the existence of another place of lodging); *Pour*, 160 F.4th at 907 (same); *Lee v. Hartford Underwriters Ins. Co.*, 113 F. App'x 203, 204 (9th Cir. 2004) (applying the *Boatright* factors and finding

---

[4] Mr. Sepic testified that, *before* construction began on the Madison Street Home, they would host friends at the Belcaro Drive Home.  *See* [Doc. 80-9 at 50:13–51:4]; *see also* [*id.* at 44:8–45:8].  This evidence does not establish that they entertained friends at the *Madison Street Home*.  Indeed, Mr. Sepic stated that it was "accurate" to say that, "after construction began," their hosting at the Madison Street Home was "limited to just having [their] friends tour the property as it was being constructed."  [Doc. 80-6 at 50:25–51:4]; *see also* [Doc. 80-9 at 29:16–21 (Ms. Sepic stating:  "I don't know if we hosted friends.  I would say we had them to the house to, you know, monitor the progress because they also, you know, liked to see it and walk through it.")].

11

no residency where the person "only occasionally spent the night at the . . . residence").[5] As for the fact that they had mail sent to the Madison Street Home, [Doc. 80 at ¶ 41], "many people receive mail at places other than their residences," *Korbel*, 308 F. App'x at 805. And while the Sepics spent some time at the Madison Street Home, simply checking in on the construction's progress, showing the progress to their friends, or making sure the grass had been mowed does not help demonstrate that they *resided* there. *See id.* (the plaintiff did not reside at a house where he was only present if he was "[w]orking on the house, picking up mail, checking on something, [or] waiting on someone"); *Adkisson v. Safeco Ins. Co. of Ind.*, No. 6:23-cv-00146-JDK, 2024 WL 5049974, at *9 (E.D. Tex. Nov. 15, 2024) (although plaintiff spent time at the property "performing renovations," "this evidence [did] not indicate that the property was his 'residence'"), *recommendation adopted*, 2024 WL 5047868 (E.D. Tex. Dec. 9, 2024); *compare McMillan v. State Farm Ins. Lloyds*, 814 F. Supp. 3d 824, 832 (S.D. Tex. 2025) (finding genuine dispute of material fact as to whether plaintiff resided in second home where she "lived" at the house "for weeks at a time all the time," furnished the property, and spent holidays there). "[W]hen a person actually lives in one location, and sporadically visits, or keeps certain

---

[5] Defendants cite *Grippin v. State Farm Mutual Automobile Insurance Company*, 409 P.3d 529 (Colo. App. 2016), for the proposition that "[r]esidency doesn't require that a person sleep at a given place, or keep a certain number of possessions there, or even use it in a particular manner." [Doc. 80 at 17 (citing *Grippin*, 409 P.3d at 533)]. The cited portion of *Grippin* does not clearly support this proposition, and instead explains that a person may have more than one place of residence. *See* 409 P.3d at 533. While true, this does not change the Court's analysis with respect to whether the Sepics resided at the Madison Street Home. At bottom, to reside at a place, a person must live or dwell there for at least a considerable amount of time. *Korbel*, 308 F. App'x at 805. Defendants have not established a genuine issue of material fact as to whether they did so.

personal items at, another location, it is the location where he lives that is his residence."
*Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 560 (3d Cir. 2008).

Similar cases out of other jurisdictions support this point. First, in *Adkisson*, the plaintiff argued that summary judgment was inappropriate because there was a genuine issue of material fact as to whether he resided at the subject home. 2024 WL 5049974, at *9 (applying Texas law). In so arguing, the plaintiff relied on evidence that (1) he regularly visited the property; (2) he received mail at the property; (3) his voter registration was tied to the property; (4) he kept "living room and dining area property" at the property; and (5) he maintained utilities at the property. *Id.* The court was unpersuaded that this evidence was insufficient to avoid summary judgment, concluding that the record evidence indicated that he "only resided" at another home—"his 'dwelling' place where he actually live[d]" and "predominantly stayed." *Id.* at *9–10.

In *Korbel*, an insured argued that he resided at a house because (1) his driver's license listed the address; (2) he received mail at that address; and (3) he visited the house every day. 308 F. App'x at 805 (applying Louisiana law). The Fifth Circuit was unpersuaded by this argument. Although the insured "clearly spent a great deal of time working on the house and intended it to be his residence in the future," his evidence was insufficient to raise a genuine issue of fact about residency because "he only sometimes slept at the house when working late on renovations," much of the house "had been gutted," and he "was only there if he was" working on the house or "checking on something." *Id.* The Fifth Circuit further concluded that the insured "clearly resided at his parents' house," where he ate, bathed, and usually slept. *Id.*

13

Finally, in *Pour*, the Eighth Circuit concluded that "applying the plain meaning of the phrase 'where you reside' to the facts of th[at] case [was] quite simple." 160 F.4th at 907. *Pour* is somewhat factually distinguishable from this case because the plaintiff in *Pour* lived in a completely different state and visited the subject home only three to four times over the course of two years. *Id.* But *Pour* is nevertheless helpful to this Court's analysis because, in ruling that the evidence "establish[ed] that [the plaintiff] did not reside" at the home, the Eighth Circuit highlighted that—like the Sepics—the *Pour* plaintiff "did not live at the [subject] home for *any* amount of time." *Id.* (quotation omitted); *see also GeoVera Specialty Ins. Co. v. Joachin*, 964 F.3d 390, 392–93 (5th Cir. 2020) (recognizing that the plaintiffs never resided in a home where they never moved in).

Although *Adkisson*, *Korbel*, and *Pour* do not apply Colorado law, the Court finds them instructive and persuasive. After all, the plain meaning of the word "reside" does not change across state lines. No reasonable jury could conclude, based on Defendants' evidence, that they resided—actually *lived*—at the Madison Street Home. And although Defendants subjectively believe and insist that their evidence establishes otherwise, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

14

Defendants have not established a genuine dispute of material fact as to whether the Madison Street Home falls within the definition of "residence premises" and is covered under the Policy.  Therefore, insofar Plaintiff seeks judgment in its favor of the portion of its declaratory judgment claim related to coverage for fire damage to the Madison Street Home,[6] the Motion for Summary Judgment is **GRANTED**.

And because there is no coverage for building property damage to the Madison Street Home, American Economy could not have breached the insurance contract by denying those benefits.  It follows that Defendants cannot succeed on their breach of contract counterclaim to the extent they allege that "American Economy breached the Policy's terms by . . . denying coverage and refusing to pay benefits for covered damage, including . . . dwelling. . . benefits."  [Doc. 15 at ¶ 94].  *See Jenkins v. State Farm Fire & Cas. Co.*, No. 15-cv-02691-CMA-NYW, 2017 WL 11544767, at *2 (D. Colo. May 31, 2017) ("In order to prevail on a breach of contract claim pursuant to an insurance policy, the insured must first show that there was coverage under the policy."); *Markel Ins. Co. v. Hollandsworth*, 400 F. Supp. 3d 1155, 1160 (D. Colo. 2019) ("Given the Court's conclusion that Hollandsworth is not entitled to coverage as a matter of law,

---

[6] The Court construes Plaintiff's Motion for Summary Judgment to seek affirmative relief only with respect to parts (B) and (E) of its declaratory judgment claim.  *See* [Doc. 1 at ¶ 47(B) (seeking a declaration "[t]hat the [Madison Street Home] is not a "residence premises" shown in the Policy Declarations"); *id.* at ¶ 47(E) (seeking a declaration that "[t]hat no coverage is available under the Policy for any damage to the Madison Street [Home] as a result of the December 30, 2023 fire")].  Plaintiff's declaratory judgment claim also seeks other relief—for example, a declaration that "any and all damage to the Residence Premises located at 3500 Belcaro Drive, Denver, Colorado 80209-4917 resulted from the intentional and deliberate demolition of the Residence Premises by or at the direction of one or more of the Defendants, with the intent to cause a loss to the Residence Premises."  [*Id.* at 9].  Plaintiff does not move for summary judgment on this portion of the declaratory judgment claim.  [Doc. 69].

Hollandsworth's counterclaims—namely, breach of contract and statutory bad faith of insurance contract—also fail as a matter of law."). As such, the Motion for Summary Judgment is **GRANTED** to the extent it seeks judgment in Plaintiff's favor on this portion of Defendants' breach of contract counterclaim.

However, as mentioned above, the Sepics also allege that Plaintiff breached the Policy by "denying coverage and refusing to pay benefits for . . . personal property." [Doc. 15 at ¶ 94]. American Economy does not address personal property benefits in its Complaint, *see* [Doc. 1], and it does not expressly address personal property coverage in its Motion for Summary Judgment, *see* [Doc. 69]. In fact, it takes the position that "Defendants have not made [an insurance] claim for damage to personal property." [Doc. 91 at ¶ 33]. The Sepics, meanwhile, take the position that they did submit such a claim, arguing that "[l]ike every insured, they made a claim for benefits" and "[t]he Policy didn't require them to use any magic words" or "submit an inventory of their damaged personal property." [Doc. 80 at 14].

Whether or not the Sepics sought payment of benefits for damaged personal property is thus subject to dispute and cannot be resolved by the Court. Accordingly, the Court goes on to address Plaintiff's alternative non-coverage argument for this limited portion of Defendants' breach of contract counterclaim.

## II.    Breach of Contract Claim—Personal Property

The Court assumes without deciding that Defendants have asserted a breach of contract claim arising out of an alleged denial for coverage over their personal property damaged in the fire. American Economy argues that there is no coverage under the Policy at all because Defendants failed to satisfy preconditions to coverage. *See* [Doc.

16

69 at 15–17].  And for this reason, Plaintiff asserts, Defendants cannot establish the requisite elements of their breach of contract counterclaim.  [*Id.* at 17].

It is undisputed that the Policy instructs that American Economy "will pay claims and provide coverage as described in this policy if [the Sepics] pay [their] premiums when due, comply with all applicable provisions outlined in this policy, and inform [American Economy] of any change in title, use, or occupancy of the residence premises."  [Doc. 69-1 at 29].  American Economy argues that Defendants violated this provision because they (1) told American Economy that they intended to move into the Belcaro Drive Home "but now admit that statement was inaccurate," and (2) failed to inform American Economy that they had demolished the Belcaro Drive Home.  [Doc. 69 at 15].

The Sepics' argument in response is quite limited.  They first argue that "[t]he Court has already recognized this is a fact question for the jury."  [Doc. 80 at 20].  This assertion is not entirely accurate.  When ruling on the Sepics' motion for summary judgment, the Court determined that summary judgment in Defendants' favor on the declaratory judgment claim was inappropriate because "American Economy ha[d] adduced sufficient evidence to create a genuine dispute of material fact as to whether Defendants complied with their requirement to alert Plaintiff about any change in use, title, or occupancy of the home."  [Doc. 68 at 8].  But it does not follow that this issue must automatically be sent to the jury if Plaintiff can carry its burden now.

Next, the Sepics argue that "having denied all coverage and paid no benefits, American Economy is in no position to insist that the Sepics had to meet any of their obligations under the Policy."  [Doc. 80 at 20].  This assertion is not supported by *any* argument.  And the prior-breach cases cursorily cited in support do not help Defendants'

17

position, given that the Policy language is clearly a *condition precedent* to coverage; it is axiomatic that an insurer's subsequent denial of coverage does not absolve an insured's failure to comply with a condition required for coverage to exist in the first place.[7]

Finally, the Sepics contend that they "told Colorado Insurance three times they would be tearing the home down and rebuilding the next year." [*Id.* (emphasis omitted)].[8] But all of these purported notices spoke of tearing down the home at some uncertain future time. *See* [Doc. 38-2 at 1 (Mr. Sepic stating on November 6, 2019, before he owned the Belcaro Drive Home, that he "plan[ned] on eventually tearing the home down and building *at some point*" (emphasis added)); Doc. 80-3 at 1 (Mr. Sepic emailing on November 6, 2019: "I just need insurance on an existing house that *I would rent out for*

---

[7] In *Melssen v. Auto-Owners Insurance Co.*, the Colorado Court of Appeals held that an insured's failure to obtain the insurer's consent to settle may be excused if the insured reasonably believes that the insurer denied coverage on another ground. 285 P.3d 328, 335–36, 337 (Colo. App. 2012). *Melssen* is distinguishable. And in *Coors*, an insurer breached the insurance policy by overcharging its insured, and the insured rescinded the policy. *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 62–63 (Colo. 2005). The insurer then tried to enforce the policy's early termination penalty. *Id.* at 63. The Colorado Supreme Court concluded that the insurer could not enforce the termination provision because "[u]nder contract law, a party to a contract cannot claim its benefit where he is the first to violate its terms." *Id.* at 64. This "prior breach" doctrine "is an equitable argument typically asserted by a defendant who has been sued for specific performance by a plaintiff who was the first to breach the contract." *DTC Energy Grp. v. Hirschfeld*, 912 F.3d 1263, 1274 (10th Cir. 2018) (first citing *In re Country World Casinos, Inc.*, 181 F.3d 1146, 1150 (10th Cir. 1999); then citing *Sci. Packages, Inc. v. Gwinn*, 301 P.2d 719, 722 (Colo. 1956) (en banc)). This doctrine does not apply here, where Defendants have failed to direct the Court to *any* evidence that Plaintiff breached the Policy aside from simply denying coverage, which Defendants concede happened after the Sepics failed to inform American Economy that they demolished the Belcaro Drive Home. *See* [Doc. 80 at 3 (admitting that they never informed Plaintiff of the demolition); *id.* at 14 ("American Economy denied all coverage six months after the fire")]; *see also DTC Energy Grp.*, 912 F.3d at 1274 (affirming conclusion that prior breach doctrine was not applicable where the plaintiff sought "to use the doctrine as a sword to create liability for [the defendant] where the text of the [parties] agreement provide[d] for none").

[8] It is undisputed that Colorado Insurance is American Economy's agent. [Doc. 80 at ¶ 5; Doc. 91 at 3].

*the next year*.  I am going to tear the house down *after the year*." (emphases added));

Doc. 80-4 at 1 (claim file notes from November 13, 2019 stating that "[Mr. Sepic] would

like to eventually tear this property down and rebuild")].  And it is undisputed that the

Sepics *never actually informed* American Economy that they did, indeed, demolish the

Belcaro Drive Home.  [Doc. 69 at ¶ 15; Doc. 80 at 3; Doc. 69-3 at 17:16–23].

Mr. Sepic's vague assertions that he planned to eventually, at some point,

demolish the Belcaro Drive Home cannot, as a matter of law, satisfy the unambiguous

pre-coverage requirement that the Sepics "inform [American Economy] of any change in

title, use, or occupancy of the residence premises."  [Doc. 69-1 at 29].  "Where terms of

an insurance policy are unambiguous, [courts] enforce the terms *as written*."  *Cotter Corp.*

*v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 834 (Colo. 2004) (emphasis added).[9]

The Policy did not require the Sepics to inform American Economy of an *intent* to change

the title, use, or occupancy.  It required them to inform American Economy of the change

*itself*.  And it is undisputed that they did not do so.  [Doc. 69 at ¶ 15; Doc. 80 at 3; Doc.

69-3 at 17:16–23]; *see also Cyprus Amax Mins. Co. v. Lexington Ins. Co.*, 74 P.3d 294,

299 (Colo. 2003) ("Courts may neither add provisions to extend coverage beyond that

contracted for, nor delete them to limit coverage.").

Because it is undisputed that Defendants did not comply with a condition precedent

to coverage, there is no coverage available under the Policy for any personal property

damage arising from the subject fire.  *See Mehic v. Allstate Prop. & Cas. Ins. Co.*, 587 F.

Supp. 3d 1327, 1333 (N.D. Ga. 2022) (finding this same provision was a condition

precedent to coverage, and the plaintiff's "failure to inform Allstate of the changes in use

---

[9] The Sepics do not argue that this Policy provision is ambiguous.  [Doc. 80].

of the Home violated the terms of the Policy"); *Bauer v. Travelers Home & Marine Ins. Co.*, No. 3:15-cv-00348-CLS, 2017 WL 264460, at *13 (N.D. Ala. Jan. 20, 2017) (concluding, at summary judgment, that because the plaintiff did not inform insurer of change in occupancy after she left the property, she was not entitled to coverage); *Swanson v. Allstate Indem. Co.*, No. 2:09-cv-02148-SLB, 2011 WL 13175838, at *11 (N.D. Ala. Aug. 4, 2011) ("Because it is undisputed that Swanson failed to inform Allstate before the fire of the vacancy at the Property, the court concludes that Swanson failed to comply with a condition precedent to coverage under the Policy."), *aff'd*, 463 F. App'x 838 (11th Cir. 2012); *Nationwide Mut. Fire Ins. Co. v. McDermott*, 603 F. App'x 374, 379 (6th Cir. 2015) ("[B]ecause McDermott failed to report the change in use of the premises to Nationwide—a change in use that would have had a great impact on the premium risk—she cannot recover under the policy.  To hold otherwise would make Nationwide liable for a risk it did not assume.").  Therefore, insofar as the Sepics assert a breach of contract counterclaim based on a failure to provide coverage for personal property damage, that claim cannot succeed, and Plaintiff is entitled to summary judgment on it.  *See Harris v. Allstate Ins. Co.*, No. 09-cv-01953-LTB-MJW, 2010 WL 2543560, at *4 (D. Colo. June 22, 2010) (granting summary judgment in favor of insurer on breach of contract claim where the insured failed to satisfy conditions precedent to coverage, and "[n]o reasonable trier of fact could conclude otherwise").  The Motion for Summary Judgment is **GRANTED** with respect to any remaining portion of Defendants' breach of contract claim.

### III.    Bad Faith Claims

There are two types of insurance-related bad faith claims available under Colorado law.  First, Colorado statutes impose certain obligations on insurance companies,

instructing that insurers "shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant."   Colo. Rev. Stat. § 10-3-1115(1)(a).  A claim alleging an unreasonable delay or denial of insurance benefits under this statute is often referred to as a "statutory bad faith" claim.  *Gardner v. State Farm Mut. Auto. Ins. Co.*, 639 F. Supp. 3d 1158, 1163 (D. Colo. 2022).  To succeed on this claim, the insured must establish that (1) the insurer delayed or denied payment of benefits to the insured, and (2) the delay or denial was without a reasonable basis.  *Am. Fam. Mut. Ins. Co. v. Barriga*, 418 P.3d 1181, 1185–86 (Colo. 2018).

Defendants assert both common law and statutory bad faith counterclaims, *see* [Doc. 15 at ¶¶ 97–109], and American Economy moves for summary judgment on both. It argues that "Defendants' bad faith claims rise and fall with their breach of contract claim" because "Colorado law is clear that bad faith claims cannot survive if there is no coverage under the policy."  [Doc. 69 at 18].  This assertion is not entirely accurate.  To be sure, it is well-established that a *statutory* bad faith claim requires a showing that benefits are indeed owed under the subject insurance policy.  *See TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1201 (D. Colo. 2018) (to prevail on the claim, the plaintiff must provide that "(1) benefits were owed under the policy; and (2) defendant unreasonably delayed or denied payment of plaintiff's claim").  "[W]here no benefits are owed, then payment of those benefits cannot, as a matter of law, have been unreasonably delayed to the insured or denied by the insurer."  *Keller v. State Farm Mut. Auto. Ins. Co.*, No. 22-cv-00474-CMA-KAS, 2023 WL 6048790, at *9 (D. Colo. Sept. 15, 2023), *recommendation adopted*, 2023 WL 7458357 (D. Colo. Oct. 2, 2023).  Thus, American Economy is correct in asserting that because there is no coverage, Defendants cannot

succeed on their statutory claim.   The Motion for Summary Judgment is therefore **GRANTED** as to the statutory bad faith claim.

However, a common law bad faith claim can "encompass[] the entire course of conduct" between the insured and the insurer, *Pham v. State Farm Mut. Auto. Ins. Co.*, 70 P.3d 567, 572 (Colo. App. 2003), and a bad faith claim "exists independently from the liability imposed by the insurance contract," *Flickinger v. Ninth Dist. Prod. Credit Ass'n of Wichita*, 824 P.2d 19, 24 (Colo. App. 1991).   "Colorado recognizes the viability of a [common law] claim of bad faith even if the express terms of the contract have been honored by the insurer."  *Dunn v. Am. Fam. Ins.*, 251 P.3d 1232, 1235 (Colo. App. 2010). In other words, if a bad faith claim is based not on the denial of coverage, but on the insurer's alleged bad faith in the investigation, defense, handling, or settling of a claim, the absence of coverage will not necessarily preclude a bad-faith claim.  *See MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1193 (10th Cir. 2009) ("It is settled law in Colorado that a bad faith claim must fail if, as is the case here, coverage was properly denied and the plaintiff's *only claimed damages flowed from the denial of coverage*." (emphasis added)).

The Sepics' common law bad faith claim alleges that American Economy "breached its dut[y] of good faith and fair dealing by numerous unreasonable acts and omissions," including "[f]ailing to conduct a prompt and thorough investigation of coverage based upon all available information," "[m]isrepresenting pertinent facts and insurance policy provisions relating to coverage," and "[p]lacing American Economy's interests over those of its insureds."  [Doc. 15 at ¶ 99].  Thus, on its face, Defendants' common law counterclaim is not limited to just the denial of coverage.  And although these allegations

are somewhat cursory, they undercut Plaintiff's assertion that "Defendants' claimed damages are based upon Plaintiff's alleged failure to pay benefits owed." [Doc. 69 at 18].

In its reply brief, American Economy asserts that "Defendants have now withdrawn their bad faith expert and have no evidence that Plaintiff acted in derogation of insurance industry standards." [Doc. 91 at 10]; *see also* [Doc. 82 at 1 ("Because American Economy has disclosed no affirmative experts of its own, because [they] cannot present any testimony from [their] rebuttal experts 'unless and until' the testimony they were designated to rebut is given at trial, and because American Economy testified to all of the governing insurance industry standards during its 30(b)(6) deposition, the Sepic Defendants have elected not to call Professor Helveston as an expert witness at trial")]. This argument was not raised in Plaintiff's Motion for Summary Judgment. *See* [Doc. 69]. However, the Court is mindful that such an argument was not available to Plaintiff at the time it filed its Motion, since Defendants did not withdraw their expert until several weeks after the Motion was filed.

When a party raises new arguments in a reply brief, a court may either permit a surreply or disregard the new arguments. *See Green v. U.S. Anesthesia Partners of Colo., Inc.*, No. 22-1319, 2023 WL 7015660, at *7 (10th Cir. Oct. 25, 2023) (citation omitted). "[A] district court abuses its discretion only when it both denies a party leave to file a surreply and relies on new materials or new arguments in the opposing party's reply brief." *Conroy v. Vilsack*, 707 F.3d 1163, 1179 n.6 (10th Cir. 2013).

If Plaintiff is correct that Defendants have no evidence to support an essential element of their common law claim, then summary judgment may be appropriate. *See McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) ("[S]ummary judgment may be

warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." (quotation omitted)).  Because Plaintiff's new argument could not have been raised in the affirmative Motion, and because this Order has significantly narrowed the remaining claims in this case, the Court finds it most efficient to order Defendants to file a short surreply addressing Plaintiff's argument that Defendants cannot adduce evidence that Plaintiff violated industry standards.  [Doc. 91 at 10].  The surreply shall not exceed five pages and shall be filed on or before **June 29, 2026**.  The portion of the Motion for Summary Judgment that seeks judgment on Defendants' common law bad faith claim is therefore **RESERVED** pending additional briefing.

In addition, because this Order does not completely resolve Plaintiff's declaratory judgment claim, *see* supra note 6, it is **ORDERED** that on or before **June 29, 2026**, Plaintiff shall file a status report informing the Court whether it intends to proceed on the remaining portions of its declaratory judgment claim.

## CONCLUSION

For the reasons set forth in this Order, **IT IS ORDERED** that:

(1)    Plaintiff's Motion for Summary Judgment [Doc. 69] is **GRANTED in part** and **RESERVED in part**;

(2)    The Motion is **GRANTED** as to the portion of Plaintiff's declaratory judgment claim seeking a declaration that there is no building property coverage available in this case; Defendants' breach of contract claim; and Defendants' statutory bad faith claim.  Judgment will enter in favor of Plaintiff and against

24

Defendants on these claims at the time this Court enters final judgment in this case;

(3)     The Motion is **RESERVED** with respect to Defendants' common law bad faith claim;

(4)     On or before **June 29, 2026**, Defendants shall file a surreply, not to exceed five pages, addressing Plaintiff's argument that Defendants cannot adduce evidence that Plaintiff violated industry standards;

(5)     On or before **June 29, 2026**, Plaintiff shall file a status report informing the Court whether it intends to proceed on the remaining portions of its declaratory judgment claim; and

(6)     In light of the Court's rulings herein, Plaintiff's Motion to Exclude Opinions of Keon O. Bates and Sue Brendoff of MKA International, Inc. [Doc. 72] is respectfully **DENIED as moot**.[10]

DATED:  June 8, 2026                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge

---

[10] These individuals were disclosed as experts to testify about "the cost to repair the damage to the premises as a result of the fire at issue in this litigation."  [Doc. 72-1 at 5, 7–8].  Because the Court has ruled that there is no coverage for building property damage arising from the fire, the motion to exclude those experts' opinions is moot.